## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **AMANDA L. COLE**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action Number** |
| | ) | **6:17-cv-02180-AKK** |
| **NANCY A. BERRYHILL,** | ) | |
| **Commissioner, SSA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Amanda Cole brings this action pursuant to Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the Administrative Law Judge's denial of disability insurance benefits, which has become the final decision of the Commissioner of the Social Security Administration ("SSA"). For the reasons explained below, the court affirms the decision.

### I.    Procedural History

Cole worked previously as a technical support person, restaurant hostess, retail sales person, and physical therapy aide until she stopped working in December 2014 due to her alleged disability. Docs. 4-6 at 13-18; 4-7 at 7. Cole filed her application for Disability Insurance Benefits ("DIB") on July 23, 2015

asserting that she suffered from a disability beginning on August 1, 2013, due to depression, anxiety, narcolepsy, and a back injury. Docs. 4-4 at 2, 15; 4-7 at 31. After the SSA denied her application, Cole requested a formal hearing before an ALJ. Doc. 4-5 at 11. Ultimately, the ALJ entered a decision finding that Cole was not disabled. Doc. 4-3 at 16. The Appeals Council affirmed, rendering the ALJ's decision the final decision of the Commissioner. *Id.* at 2. Having exhausted her administrative remedies, Cole filed this action pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g). *Id.* at 12.

## II.    Standard of Review

First, federal district courts review the SSA's findings of fact under the "substantial evidence" standard of review. 42 U.S.C. §§ 405(g), 1383(c); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence." *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (internal citations omitted). If supported by substantial evidence, the court must affirm the Commissioner's factual findings, even if the evidence preponderates against the Commissioner. *Id.*

Credibility determinations are the province of the ALJ. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). However, "[t]he testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary," and the failure of the Secretary "to specify what weight is given to a treating physician's opinion and any reason for giving it no weight" constitutes reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Courts have found good cause to discount a treating physician's report when it is "not accompanied by objective medical evidence, . . . wholly conclusory," or "inconsistent with [the physician's] own medical records." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). In contrast to the opinion of a treating physician, "the opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).

Second, federal courts review the SSA's conclusions of law de novo, *see Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987), and "[f]ailure to apply the correct legal standards is grounds not for remand but, for reversal." *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). No presumption attaches to either the ALJ's choice of legal standard or to the ALJ's application of the correct legal standard to the facts. *Id.*

Finally, reviewing courts have the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (emphasis added).

## III.    Statutory and Regulatory Framework

An individual applying for DIB bears the burden of proving that she is disabled. *Moore*, 405 F.3d at 1211. To qualify, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(I)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. § 404.1520. Specifically, the Commissioner must determine, in sequence:

(1)    whether the claimant is doing substantial gainful activity;
(2)    whether the claimant has a severe impairment;
(3)    whether the impairment meets or is medically equivalent to one listed by the Secretary;
(4)    whether the claimant is unable to perform his or her past work; and

(5)     whether the claimant is unable to perform any work in the national economy, based on his residual functional capacity.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"  *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work, the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV.    The ALJ's Decision

The ALJ applied the five-step analysis for DIB claims, *see McDaniel*, 800 F.2d at 1030, and found that Cole satisfied step one because she had not engaged in substantial gainful activity since December 4, 2014.  Doc. 4-3 at 20.  At step two, the ALJ found that Cole has "severe impairments" caused by depression, anxiety, and narcolepsy.  *Id.* (citing 20 C.F.R. § 404.1520(c)).  However, the ALJ found that Cole's back pain was not a "severe impairment" due to the "mild findings" of her "diagnostic imaging procedures."  *Id.* at 21.  At step three, the ALJ concluded that Cole's mental impairments did not meet the severity or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 for affective disorders and § 12.06 for anxiety-related disorders.  *Id.* at 21-22.  Next, the ALJ determined Cole's residual functional capacity ("RFC") and

found that Cole can "perform a range of work at all exertional levels" with limitations on exposure to hazardous machinery and minimal contact with the public. *Id.* at 22-23. (citing 20 C.F.R. §§ 404.1529 and 1527). Based on the RFC, and relying on the testimony of a vocational expert ("VE"), at step four, the ALJ found that Cole could not return to her past relevant work. *Id.* at 25. The ALJ then proceeded to step five, where based on Cole's RFC, age, prior work experience, and the VE's testimony, the ALJ concluded that Cole is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," including work as a furniture cleaner, marker, and button reclaimer. *Id.* at 27. Therefore, the ALJ concluded that Cole was not disabled from the alleged onset date through the date of his decision.

V.   **Analysis**

On appeal, Cole argues that the ALJ erred by failing to (1) holistically assess her physical and mental impairments, (2) consider the opinion of her treating psychiatrist Dr. Terry Bentley, and (3) properly discredit her credibility. Doc. 10 at 12-26. For the reasons discussed below, the ALJ's decision is due to be affirmed.

A. Whether the ALJ Failed to Conduct a Holistic Assessment of Cole's Impairments

When a plaintiff has multiple illnesses that serve as the basis for the disability claim, the "disability claimant should be evaluated as a whole person,

and not evaluated in the abstract as having several hypothetical and isolated illnesses." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Therefore, the "ALJ must consider the combined effects of a claimant's impairments in determining whether she is disabled [and] . . . make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987).

At issue here is the ALJ's alleged failure to properly consider Cole's physical impairment related to back pain and injury. Doc. 10 at 14-15. Cole attacks the ALJ's decision for failing to discuss medical records including a June 2012 MRI revealing "what maybe early degenerative changes" in the sacrum, medical notes of "bilateral sclerosis of the left and right SI joints," and Dr. Gregory Stidham's reports of Cole's subjective complaints of chronic back pain on twelve occasions. Doc. 4-9 at 40.

In his decision, the ALJ at step two noted that Cole failed to demonstrate that her lower back and hip pain met the threshold of a "severe impairment" because although the medical record included Cole's subjective complaints of back pain, the "objective medical evidence documents only minor musculoskeletal abnormalities." Doc. 4-3 at 21. The substantial evidence supports this finding. Indeed, Cole's records reflect, as the ALJ cited, that Cole's back pain was not severe: (1) a September 2013 MRI scan revealed "a mild disc prominence at L5-S1

compatible with a small disc protrusion and resulting in no neural compromise," doc. 4-11 at 44; (2) x-rays of Cole's "thoracic and lumbar spine and pelvis in August 2014 revealed no evidence of any joint or disc degeneration," doc. 4-9 at 42;  (3) Dr. Garry Magouirk found that the left and right hip x-rays revealed no abnormalities,  *id.* at 45-52; and (4) Dr. Wesley Spruill noted that an April 2014 x-ray indicated that Cole's "alignment is appropriate, . . . no fracture is seen, [and] . . . prevertebral soft tissues are within normal limits,"  doc. 4-8 at 11, that an April 2015 MRI revealed "no abnormal signal within disc material or bone" and "no fractures [or] dislocations," *id.* at 20, and that a March 2016 MRI of Cole's spine "shows a very small disc protrusion without impingement" and that the lab work returned "normal with no evidence of arthritis," doc. 4-10 at 64.  The ALJ also determined that although obesity is a medically determinable impairment that can exacerbate musculoskeletal impairments, Cole's weight has remained stable and there was no medical basis to find that obesity imposed any significant physical limitations.  Doc. 4-3 at 22.  Consequently, in light of the ALJ's finding that Cole's back pain was not a severe impairment at Step Two, the ALJ was not required to consider her physical impairment in combination with her mental impairments at Step Three.  *Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848 (11th Cir. 2006) (holding that because the ALJ determined that only one physical impairment was severe, the "ALJ was not required to consider the mental condition in combination

with [the claimant's] other impairments").  Therefore, Cole's contention about the holistic assessment is unavailing.

   B. <u>Whether the ALJ erred by giving limited weight to the opinion of Cole's treating psychiatrist</u>

Cole also challenges the weight the ALJ gave to the opinion of her treating psychiatrist, Dr. Bentley, who opined that Cole had "extreme limitations." Doc. 10 at 15. The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440). "Good cause exists 'when []: (1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting *Phillips*, 357 F.3d at 1241). The ALJ must clearly articulate the reasons for not giving substantial or considerable weight to a treating physician's opinions.  *Id.* Moreover, although a physician's opinion is relevant evidence, ultimately "[a] claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive." *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ gave Dr. Bentley's opinion little weight due to Cole's inconsistent visits, limited and conservative treatment, lack of objective support to satisfy the Paragraphs B and C criteria, and inconsistency with the state examining physician's report. Doc. 4-3 at 23-24. In challenging the ALJ's decision, Cole maintains that her lack of insurance caused gaps in her psychiatric treatment, doc. 10 at 12, and asserts that the ALJ erred by failing to take this into account. While Cole is generally correct that poverty may excuse her failure to seek treatments,[1] the ALJ also discredited Dr. Bentley's opinion for three other reasons that Cole fails to address and that are unrelated to poverty. First, the ALJ noted that Dr. Bentley and Dr. Stidham's conservative treatment plan for Cole was inconsistent with Dr. Bentley's September 2016 Mental Medical Source Opinion that Cole had "extreme limitations" (i.e., no useful functioning) when responding appropriately to supervisors, co-workers, members of the public, changes in schedule, following complex instructions, and responding to work pressures and that Cole had "marked limitations" (i.e., serious interferences) when using judgment for simple work decisions and maintaining daily living activities. Doc. 4-10 at 38-39. The ALJ noted that Dr. Bentley and other treating physicians "never . . . admitted [Cole] for

_____

[1] Cole states that she was "unable to see [her] regular psychiatrist due to insurance," doc. 4-7 at 77; Dr. Bentley provided sworn testimony that Cole was "having trouble now coming [to visits] because of an insurance issue," doc. 4-10 at 47; and Cole reported that "her insurance will not cover [Dr. Bentley's] services any longer and she [instead] gets her psychiatric medications from her primary care provider, doc. 4-11 at 50. Under such circumstances, the ALJ has "an obligation to scrupulously and conscientiously probe into the reasons underlying [Cole's] course of treatment" and may not make credibility determinations based on a "failure to seek additional medical treatment" without developing the record as to the reasons for that failure. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1269 (11th Cir. 2015) (internal quotations omitted).

inpatient psychiatric treatment or referred [her to] other intensive forms of mental health treatment." Doc. 4-3 at 23-25.

Second, as the ALJ noted, the medical record as a whole contradicts Dr. Bentley's medical source opinion. A review of the record supports the ALJ's finding. For example, during an initial assessment in May 2015, Dr. Bentley noted that Cole was "working on and off for a local seafood [restaurant]" and had "severe" symptoms of fatigue, difficulty with concentration, and fear of places. Doc. 4-8 at 47. Dr. Bentley noted in his Mental Status Exam (MSE), however, that Cole was oriented in time and place and had adequate insight, logical thoughts, appropriate attire and affect, moderate anxiety, satisfactory attention span, undisturbed memory, precise speech, no delusions, no hallucinations, no inappropriate behavior, and no obsessions or compulsions. *Id.* at 47-51. Subsequent biweekly visits over the following year reveal periodic improvements and setbacks showing — (1) in June 2015, that Cole's mood did not improve, doc. 4-9 at 72-75; (2) in July 2015, that she was "feeling better," *id.* at 79-82; (3) in August 2015, that her "meds have stopped working" and that she attempted to work but had a panic attack, doc. 4-10 at 4; (4) in September 2015, that she felt depressed, *id.* at 5-6; (5) in October 2015, that she felt "better mood wise" and that "changes in medications have helped," *id.* at 7-10; (6) in November 2015, that "things are a little better," *id.* at 13-15; (7) in December 2015, that she was "feeling better and sleeping 9 hours a night," experiencing "mood swings [with] highs and

lows," and improving her anxiety management, *id.* at 15-20; (8) in January 2016, that she had "up and down days" and her doctor noted that her "meds are pretty well balanced," *id.* at 21; (9) in February 2016, that her mood improved because her husband had a job interview and that Adderall helped her focused, *id.* at 22; (10) in May and June 2016, that things were worse because her children were staying at home during a school break, *id.* at 24-25; and (12) in August 2016, that she felt depressed and spent money on unnecessary items, *id.* at 26. Throughout this period, Cole's doctors changed her medications only twice – in August 2015, when they modified her treatment plan with a new prescription in response to Cole's report that her medications had stopped working, doc. 4-10 at 4, and in December 2015, when they added Latuda 80mg  to her treatment plan, *id.* at 15-20. Also, in November 2015, her doctor recommended that she try interventions such as "distracting herself," "not shutting off," and "using grounding to spend more time with [her husband]," *id.* at 13-15.  Critically, the medical record indicates that throughout the relevant period, Cole's MSE remained unchanged and her treating doctors continued with their conservative treatment plan. *See* docs. 4-9 at 78; 4-10 at 4, 17.  Put simply, this record supports the ALJ's finding that Dr. Bentley's opinion is belied by the medical record.

Finally, the ALJ also rejected Dr. Bentley's opinion due to it being inconsistent with that of the state agency psychiatric consultant, Dr. Lee Blackmon.  Dr. Blackmon reviewed Cole's medical files, including Dr. Bentley's

treatment records, and applied the psychiatric review technique. Doc. 4-4 at 6. Based on this review, Dr. Blackmon opined that Cole's mental residual functional capacity assessment revealed that Cole could "carry out short simple instructions, . . . maintain attention and concentration for two hours, . . . [and] likely miss one to two days per month because of psychiatric symptoms." Doc. 4-4 at 6-10. Dr. Blackmon also opined that although Cole has limitations in sustained concentration and persistence, she was only "moderately limited" or "not significantly limited" in maintaining concentration for extended periods, keeping regular attendance, remembering procedures, and making work-related decisions. *Id.* at 9. Dr. Blackmon's opinion is consistent with that of a psychiatric consultative examination in the record performed by Dr. Kaycia Vansickle in November 2014, which noted that Cole's ability to "maintain attention and concentration for extended period, . . . complete a normal workday without interruptions, . . . [and] carry out and remember simple instructions" was "not significantly limited." Doc. 4-11 at 54. Therefore, based on Dr. Blackmon's opinion, which is supported by the record as a whole, including Dr. Vansickle's opinion, the ALJ did not err when he gave some weight to Dr. Blackmon's assessment over that of Dr. Bentley's medical source opinion.

To summarize, the objective medical evidence supports the ALJ's finding that while Cole has mental impairments which could produce some discomfort in the workplace, her impairments do not preclude Cole from engaging in *all* work

activity. Moreover, in light of the inconsistences in Dr. Bentley's medical source opinion and the record, including Cole's treating doctors' contemporaneous treatment notes, the ALJ assigned the proper weight to Dr. Bentley's medical opinion. *Sheldon v. Astrue*, 268 Fed. App'x 871, 872 (11th Cir. 2008) ("A doctor's conservative medical treatment for a particular condition tends to negate a claim of disability."). Therefore, Cole has failed to show that the ALJ erred in giving limited weight to the opinion of her treating physician.

C. Whether the ALJ Failed to Properly Evaluate Cole's Credibility

Cole next argues that the ALJ failed to adequately evaluate Cole's credibility by overlooking her testimony about her pain[2] and her regular treatment for chronic pain as well as mischaracterizing her daily activities. "The ALJ can make credibility determinations regarding a claimant's subjective complaints and must provide specific reasons for the credibility finding." *Ring v. Berryhill*, 241 F. Supp. 3d 1235, 1245 (N.D. Ala. 2017), *aff'd sub nom. Ring v. Soc. Sec. Admin., Comm'r,* 728 F. App'x 966 (11th Cir. 2018). Although the "credibility determination does not need to cite particular phrases or formulations . . . [,] it cannot merely be a broad rejection that is not enough to enable the reviewing court

_____

[2] Although Cole contends that the ALJ failed to also discredit her testimony about back pain, for reasons explained in Section A, *supra*, the objective evidence does not support Cole's subjective testimony about back pain. Moreover, for reasons explained in Section B, *supra*, Cole failed to cite sufficient objective evidence to support her claims of disabling mental impairments. Lastly, while Cole maintains that the ALJ neglected to mention her "bipolar disorder and panic attacks," doc. 4-4 at 2, 15, these ailments were not mentioned in her initial DIB application, the ALJ did address her panic attacks, and Cole fails to direct the court to medical records describing the disabling effects of her bipolar disorder diagnosis. *See Russell v. Astrue,* 742 F. Supp. 2d 1355, 1383 (N.D. Ga. 2010).

to conclude that the ALJ considered the medical condition as a whole." *Id.* (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). In reaching a decision, the ALJ must consider "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how . . . symptoms affect [the claimant]." 20 C.F.R. § 404.1529. However, because a claimant has "voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 416.920(c).

### 1. Subjective Complaints and Testimony about Pain

To establish a disability via a claimant's testimony about symptoms, the claimant must provide "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptom]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptom]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). In assessing the claimant's symptoms, the ALJ must consider: "the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to relieve the symptoms; treatment, other than

medication, for the symptoms; any other measure used to relieve the symptoms; and any other factors concerning functional limitations and restrictions due to the symptoms." *Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 603–04 (11th Cir. 2017) (citing § 404.1529(c)(3)). Although explicit findings as to credibility are not required, "the implication must be obvious to the reviewing court.'" *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at 1562). A review of the record here indicates that the ALJ implicitly discredited Cole's complaints of depression based on the lack of supporting objective evidence, as discussed in Section B, *supra*, and that any error related to the ALJ's failure to address Cole's testimony about narcolepsy is harmless.

### a. Depression

The ALJ properly rejected Cole's subjective complaints of depression symptoms including panic attacks, anxiety, and fatigue, finding that Cole failed to satisfy the paragraph B criteria[3] in which a claimant with mental impairments must

---

[3] The ALJ also found that Cole failed to satisfy the paragraph C criteria, which requires "a medically documented history of the alleged mental disorder "of at least 2 years [in] duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," as well as one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in "such marginal adjustment" that it is predicted that "even a minimal increase in mental demands or change in the environment" would cause decompensation; or (3) a current history of at least one year's "inability to function outside a highly supportive living arrangement," with an indication that this arrangement needs to continue. *Bellew v. Acting Com'r of Soc. Sec.*, 605 F. App'x 917, 924 (11th Cir. 2015). The ALJ noted that Cole is able to function without a highly-supportive living arrangement, has not experienced any episodes of decompensation, and does not appear likely to decompensate in response to a minor change. Doc. 4-3 at 23.

satisfy at least two of the following requirements: (i) marked restriction[4] of activities of daily living, (ii) marked difficulties in maintaining social functioning, (iii) marked difficulties in maintaining concentration, persistence, or pace, or (iv) repeated episodes of decompensation[5] of extended duration. Doc. 4-3 at 22. In making this determination, the ALJ relied on Cole's function report, documented daily activities, and the conservative nature of her treatment. Doc. 4-3 at 22-25. Based on Cole's self reporting of her daily activities, the ALJ noted that Cole could drive her kids to school, watch television, read books, help cook dinner, make sandwiches, do light laundry or house cleaning, and sometimes help her children with their homework. Docs. 4-3 at 23. Although the ALJ noted that Cole sometimes wears the same clothing for two days, forgets to shower, needs reminders for medication, and experiences severe anxiety when she leaves her home or drives distances beyond her children's school, doc. 4-7 at 24-26, the ALJ concluded that such limitations did not support a finding that her depression satisfied the paragraph B or C criteria, doc. 4-3 at 23.

---

[4] "'Marked' means 'more than moderate but less than extreme;' marked restriction occurs when the degree of limitation seriously interferes with a claimant's ability to function 'independently, appropriately, effectively, and on a sustained basis.'" *Bellew,* 605 F. App'x at 924.

[5] "Episodes of decompensation" are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). "To meet the criterion of 'repeated' episodes of 'extended duration,' a claimant must have three episodes within one year, or an average of once every four months, each lasting for at least two weeks." *Bellew,* 605 F. App'x at 924.

The ALJ also opined that the medical record failed to support Cole's contentions of severe depression. The ALJ noted that Cole's therapists routinely indicated that Cole did not have marked or extreme limitations in social functioning or concentration, and described Cole's thought process as "coherent," that Cole had "good" insight and judgement, "clear" speech, "neat" dress, and "good" mood and eye contact, and a "cooperative" demeanor. Doc. 4-10 at 3-4; *see also* docs. 4-9 at 72-91; 4-10 at 5-26. Moreover, as explained in Section B, *supra*, the ALJ also relied on the inconsistency between Dr. Bentley's medical source opinion regarding extreme limitations in the workplace and Cole's conservative treatment plan to discredit Cole's contention that she is purportedly unable to work based on depression symptoms.

Based on this record, it is evident that the ALJ properly cited to substantial evidence to discredit Cole's testimony about the severity of her depression. Therefore, the court finds no error in the ALJ's findings. *Lowery v. Soc. Sec. Admin., Comm'r*, 729 F. App'x 801 (11th Cir. 2018) (affirming the ALJ who found "that limitations to which claimant testified were far in excess of those which reasonably would be expected from the objective clinical findings and were not consistent with all of the other evidence of record.").

### b. Narcolepsy

Cole also contends that the ALJ improperly discredited her testimony about her narcolepsy impairment, which resulted in sleep disruption, excessive tiredness

during the day, and bizarre dreams. Doc. 10 at 20. The ALJ discredited Cole's testimony because Cole "received a prescription for Nuvigil" and filled it only once in July 2009, doc. 4-3 at 20, noting that there was no indication in her "pharmacy records that she ever filled out any other prescription for narcolepsy medication." *Id*. at 21. Cole contends that the ALJ solely focused on the lack of Nuvigil refills and overlooked Dr. Bentley's sworn testimony about Cole using "Adderall to help with functioning in terms of concentration, energy, . . . [and] narcolepsy to . . . suppress the [REM] state." Doc. 4-10 at 56. Indeed, medical records from two pharmacies indicate that Cole filled prescriptions for Amphetamine, a generic form of Adderall, on at least sixty occasions between 2011 and 2016. Doc. 4-8 at 54-70. Still, even if the ALJ made his determination about Cole's narcolepsy medication in error, "the mere existence of . . . impairments does not reveal the extent to which they limit . . . [Cole's] ability to work or undermine the ALJ's determination in that regard." *Moore*, 405 F.3d at 1213 n. 6. Other than Cole's testimony about trouble sleeping at night and falling asleep during the day, doc. 4-3 at 43-44, there is no evidence in the record about the impact of narcolepsy on Cole's ability to work, or, whether Cole is not able to function despite consistently taking the generic version of Adderall. Moreover, although a July 2009 sleep study indicated a positive result for narcolepsy, there is no entry in the medical file that the condition is disabling. Instead, Cole was only prescribed medication and educated about nap therapy and the importance of

maintaining a "regular sleep-wake schedule." Doc. 4-10 at 101-103. Finally, the ALJ also implicitly accounted for Cole's narcolepsy in the hypothetical he posed to the VE, in which the ALJ noted, among other things, the need to "avoid hazardous machinery during a regularly scheduled work day . . ." Doc. 4-3 at 46. In response, the VE testified that a person with these limitations can still perform work as a furniture cleaner, marker, or button reclaimer. Doc. 4-3 at 46-48. Accordingly, regardless of the ALJ's error in focusing only on one of the prescribed medications, Cole still has failed to direct the court to any objective evidence that suggests that the functional limitations that result from narcolepsy prevent Cole from engaging in any available work. *See* 20 C.F.R. § 404.1520(d)-(f).

### 2. Documented Treatment History

Cole next maintains that the ALJ erred in ignoring her documented history of treatment for her mental impairments, including depression and anxiety. Doc. 10 at 23. To the contrary, as described in Section B, *supra*, the ALJ considered Cole's treatment history when the ALJ discredited the medical source opinion of Dr. Bentley. Although Dr. Bentley opined that Cole had extreme limitations in responding appropriately to supervisors, co-workers, and customers, as well as understanding complex instructions, the record reflects that Dr. Bentley provided conservative mental health treatment, which consisted of regularly prescribed medications with few alterations. *See* docs. 4-9 at 72-91; 4-10 at 5-26. During the alleged dates of Cole's disability, Cole received therapy visits on a biweekly basis

and was regularly prescribed medications.  Doc. 4-10 at 22.  Despite fluctuating improvements in her mood and depression, Cole's doctors modified her medications only on a handful of occasions and educated her instead about behavior interventions. *Id.*; *see also Green v. Soc. Sec. Admin., Comm'r,* 695 F. App'x 516 (11th Cir. 2017) (noting that the claimant's testimony about "panic and anxiety attacks" was inconsistent with the medical record indicating that her "medical visits were relatively infrequent and she had received primarily routine, conservative treatment for her conditions, she cared for her own personal needs, did light housework, prepared simple meals, and visited with family and friends"). As the ALJ noted,  "[t]he conservative and routine nature of this treatment plan suggests that [Cole's] impairments—while significant—were not so severe that she could not perform any job duties." *Horowitz v. Comm'r of Soc. Sec.,* 688 F. App'x 855, 861-862 (11th Cir. 2017) ("ALJs are permitted to consider the type of a treatment a claimant received in assessing the credibility of her subjective complaints."); *see also Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (recognizing that a physician's conservative medical treatment for a particular condition may negate a claim of disability).  Therefore, the court finds no error in the ALJ's consideration of Cole's limited and conservative treatment history for her mental health diagnoses in reaching his findings.

3. Report of Daily Activities

Lastly, Cole contends that the ALJ placed too much reliance on Cole's report of daily activities and mischaracterized Cole's ability to function on a daily basis. In her SSA Function Report, Cole reported that a typical day included helping her children get ready for school, driving them to school, watching television, reading books, cooking supper, and helping with her children's homework. Doc. 4-7 at 23. She also indicated that she can prepare sandwiches and meals, do laundry, make online purchases, do light cleaning, and get along with authority figures. *Id*. at 24-30. Nearly two years after her purported disability began, Cole reported in May 2015 that she still worked off and on at a local seafood restaurant but found it difficult because of her anxiety. Doc. 4-8 at 46-51. Cole's husband also filled out a Third-Party Function Report where he described that Cole is able to watch television for a few hours, read a book, cook, feed herself, use the restroom independently, take care of inside plants, do laundry, buy books online, use a checkbook, handle spoken instructions with explanations, and work well with authority figures. Doc. 4-7 at 15-22. Consistent with Cole's function report, the ALJ also noted that Cole testified about being able to "only [drive] back and forth to her sons' school because she had such severe anxiety, adding that if she tried to drive longer distances, she would have a panic attack and have to pull over and vomit at the side of the road" and that "she had such severe anxiety that she had to rely on her husband to do everything for her and spend most

of her time in her pajamas just lying in bed or on the sofa." Doc. 4-3 at 23. Contrary to Cole's contention, an ALJ may look at "factors relevant to [a claimant's] symptoms, such as pain . . . and [a claimant's] daily activities . . . " 20 C.F.R. § 404.1529(c)(3). Here, based on a review of Cole's medical record and conservative treatment plan, the ALJ did not err in considering Cole's daily activities and multiple reports, and correctly noted that Cole's daily activities are not as limited as Cole described.

## VI. Conclusion

Despite the ALJ's errors related to developing the record as to Cole's course of treatment based on financial limitations and her narcolepsy medication, the record supports the ALJ's determination that Cole is capable of adjusting to other work and that Cole has failed to meet her burden to establish a disability. *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001) ("[T]he overall burden of demonstrating the existence of a disability as defined by the Social Security Act "[u]nquestionably" rests with the claimant.") (citing 20 C.F.R. § 404.1512(a)); *see also Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) ("[T]he claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."). Therefore, the court concludes that the ALJ's determination is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching his decision. Therefore, the

Commissioner's final decision is **AFFIRMED**. A separate order in accordance with the memorandum of decision will be entered.

 **DONE** the 26th day of February, 2019.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE